**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARRY S. ZIGICH, JR. | |
| Plaintiff, | Civil Action No. 17-6105 (MAS) (DEA) |
| v. | OPINION |
| GARY M. LANIGAN, et al., | |
| Defendants. | |

**SHIPP, District Judge**

Plaintiff Garry S. Zigich, Jr. ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 1983. Presently before the Court is Defendant Gary M. Lanigan's ("Defendant Lanigan") Motion to Dismiss ("Motion") (Def.'s Mot., ECF No. 61), Plaintiff's Amended Complaint (Am. Compl., ECF No. 55). For the reasons stated below, the Court grants Defendant's Motion.

I. **BACKGROUND**

The allegations raised by Plaintiff in the Amended Complaint are accepted as true for purposes of this Opinion. By way of background, Plaintiff explains that in November of 2004, the New Jersey Department of Corrections ("NJDOC") "adopted Internal Management Procedure (IMP) MED.ICP.005, which establishes policies and procedures for treatment of inmates with [Hepatitis C] HCV infection." (Am. Compl. ¶ 28.) IMP follows the recommendations of the Center for Disease Control, and prisoners who are HCV positive are "given a complete health assessment . . . upon entering the prison system[,] . . . HCV testing is ordered . . . [and] documented by the MD/NP", and the "NJDOC Director of Medical Services . . . has the final authority in the resolution of all disputes." (*Id.* ¶¶ 29-33.) IMP also adopts the Federal Bureau of Prisons'

("FBOP") guidelines for treating federal prisoners with HCV. (*Id.* ¶¶ 29-30.) Under the FBOP guidelines, HCV is treated based on a priority list where inmates with a score of 2.0 or higher on their AST-Platelet Ration Index ("APRI"), are considered high priority for treatment. (*Id.* ¶¶ 35-37.) That priority level decreases as the APRI number decreases. (*Id.*) Plaintiff also explains that the average cost for HCV treatment in 2015 was $20,000 per patient, per month. (*Id.* ¶ 34.)

Plaintiff states that he contracted HCV in 2000, prior to his incarceration. (*Id.* ¶ 48.) On November 4, 2009, Plaintiff advised the NJDOC that he was HCV positive. (*Id.* ¶ 49.) Plaintiff was transferred to New Jersey State Prison ("NJSP") the following day, and was taken to the medical department for a physician intake evaluation, conducted by Corazon Alvarado, NP, ("Nurse Alvarado"). (*Id.* ¶¶ 51-52.) Plaintiff informed Nurse Alvarado, among other things, that he was HCV positive. (*Id.* ¶ 53.) Nurse Alvarado failed to have Plaintiff screened for HCV. (*Id.* ¶ 54.)

In June of 2013, nearly four years later, Plaintiff was tested for HCV by prison medical staff. (*Id.* ¶ 55.) Donique Ivery, NP, ("Nurse Ivery"), met with Plaintiff to discuss his diagnosis and advised Plaintiff of a waitlist for HCV treatment, due to the cost and number of inmates with the diagnosis. (*Id.* ¶¶ 56-62.) Nurse Ivery also informed Plaintiff that he was placed on a "Chronic Care" roster, and would receive quarterly blood tests and physical examinations. (*Id.* ¶ 64.) During the course of their conversation, Plaintiff informed Nurse Ivery that he had been HCV positive for at least 13 years. (*Id.* ¶ 60.)

During a Chronic Care visit in October of 2013, Nurse Ivery informed Plaintiff that his blood test revealed HCV abnormalities, and again advised Plaintiff that he was on the HCV treatment waitlist. (*Id.* ¶ 65.) At a later visit in March of 2014, Nurse Ivery informed Plaintiff that

his blood test similarly revealed abnormalities and ordered an ultrasound of Plaintiff's liver. (*Id.* ¶¶ 67–68.)

On February 27, 2015, Plaintiff had a Telemedicine video conference with Dr. Tahir Farooq ("Dr. Farooq"), a specialist in infectious disease. (*Id.* ¶ 68.) Dr. Farooq explained that Plaintiff was a candidate for HCV treatment, and recommended treatment due to Plaintiff's disease progression. (*Id.* ¶¶ 69-70.) Dr. Farooq asked that Plaintiff's chart be forwarded to Defendant Arthur Brewer ("Defendant Brewer") for administrative approval to begin HCV treatment. (*Id.* ¶ 71.) Plaintiff explains that Defendant Brewer, as Statewide Medical Director for NJDOC healthcare, must approve all treatments, procedures, or medications that require "extraordinary expense." (*Id.* ¶ 72.) Defendant Brewer rejected Dr. Farooq's findings and denied Plaintiff treatment. (*Id.* ¶ 73.)

On May 4, 2015, Plaintiff asked Nurse Ivery for a status on his treatment. (*Id.* ¶ 74.) On May 21, 2015, Plaintiff filed an inquiry form to request the HCV treatment, and filed a sick call slip asking to be seen by Abu Ahsan ("Dr. Ahsan"). (*Id.* ¶¶ 76-77.) Plaintiff was seen by Dr. Ahsan on June 5, 2015. (*Id.* ¶ 78.) During that visit, Plaintiff described both his deteriorating symptoms and Dr. Farooq's recommendation for treatment. (*Id.*) Dr. Ahsan responded that Plaintiff's APRI score of 1.2, placed Plaintiff at the bottom of the waitlist for HCV treatment. (*Id.* ¶¶ 79-80.) Plaintiff understood from Dr. Ahsan that he was competing with other inmates for treatment, and that Plaintiff would be forced to wait until his condition became significantly worse before he would receive treatment. (*Id.* ¶ 85.)

Plaintiff received a response to his inquiry regarding HCV treatment on July 1, 2015, which indicated that Plaintiff was, in fact, not on the waitlist for treatment. (*Id.* ¶ 89.) Plaintiff then filed a formal grievance, demanding HCV treatment. (*Id.* ¶ 90.) On September 11, 2015, Plaintiff

3

received a response to his formal grievance, explaining the waitlist process. (*Id.* ¶ 91.) Plaintiff appealed, but never received a reply. (*Id.* ¶ 92.)

In November 2015, Dr. Ahsan ordered an ultrasound of Plaintiff's liver and gallbladder. (*Id.* ¶ 95.) The findings showed Plaintiff's liver was "normal size and texture," while his gallbladder was "abnormal." (*Id.* ¶ 96.) Dr. Ahsan advised that he would push to have Plaintiff receive HCV treatment. (*Id.* ¶ 97.) Defendant Brewer again denied Plaintiff treatment. (*Id.* ¶ 98.)

In May of 2016, Plaintiff was informed that Dr. Ahsan was replaced by Dr. Ihuoma Nwachukwu ("Defendant Nwachukwu"). (*Id.* ¶ 101.) Defendant Nwachukwu informed Plaintiff of cheaper medications available to treat HCV and explained that "she could foresee [Plaintiff] receiving HCV treatment within the next 6-months." (*Id.* ¶ 102.) On August 15, 2016, Plaintiff's medical chart was again forwarded to Defendant Brewer for consideration of HCV treatment. (*Id.* ¶ 103.) Defendant Brewer denied Plaintiff HCV treatment for the third time. (*Id.* ¶ 104.) Plaintiff then began asking for information related to his medical records, to which the medical staff failed to respond. (*Id.* ¶¶ 105-07.)

On October 11, 2016, Plaintiff was transferred to New Hampshire State Prison. (*Id.* ¶¶ 108-09.) Upon returning to NJSP in March of 2017, Plaintiff suffered from angioedema, an autoimmune disorder. (*Id.* ¶¶ 111-12, 126.) On July 25, 2017, Plaintiff was informed that his APRI score decreased to .28, placing him at the bottom of the HCV treatment waitlist. (*Id.* ¶ 114.) Plaintiff then requested a copy of his medical records, which he avers establish that the NJDOC medical staff repeatedly "falsif[ied] his medical records" and "misrepresent[ed] his health problems." (*Id.* ¶ 117.) Plaintiff alleges that he suffers numerous HCV related symptoms, as well as anxiety and depression. (*Id.* ¶ 126.)

4

On or about August 14, 2017, Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 1.) Plaintiff filed an amended complaint which was stricken by the Court. (Order, July 16, 2018, ECF No. 51.) On or about September 12, 2018, Plaintiff filed an Amended Complaint against Gary M. Lanigan, Rutgers University Correctional Health Care, Arthur Brewer, and Ihuoma Nwachukwu, in their official and individual capacities, seeking damages, injunctive and declaratory relief. (Am. Compl. ¶¶ 120-28.) Defendant Lanigan filed the instant Motion and Plaintiff filed a Response (Pl.'s Resp. to Mot., ECF No. 62).

## II. **LEGAL STANDARD**

In resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Furthermore, *pro se* pleadings are liberally construed. *See Glunk v. Noone*, 689 F. App'x 137, 139 (3d Cir. 2017). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

## III. ANALYSIS

The Amended Complaint includes the following causes of action: (1) violation of adequate medical care under the Fourteenth Amendment; and (2) cruel and unusual punishment under the Eighth Amendment. (Am. Compl. ¶¶ 120-28.) Defendant Lanigan seeks to dismiss the Amended Complaint against him, arguing that he is immune from suit and that Plaintiff fails to state a claim for relief. (Def.'s Moving Br. 1.)

### A. Official Capacity Claims

Defendant Lanigan contends that he is immune from liability for actions taken in his official capacity. (Def.'s Moving Br. 7.) Plaintiff sues Defendant Lanigan in his official and individual capacities for damages, injunctive and declaratory relief. (*See* Am. Compl. 5.) It is well established that "[s]tate officers sued for damages in their official capacity are not 'persons'" under Section 1983. *Hafer v. Melo*, 502 U.S. 21, 27 (1991); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, Plaintiff's Section 1983 claims for *damages* against Defendant Lanigan in his *official capacity* are dismissed with prejudice.

### B. Claims Against Defendant Lanigan

Defendant Lanigan argues that the Amended Complaint fails to allege facts establishing his personal involvement in the alleged wrongdoing. (Def.'s Moving Br. 11.) The Court first turns to Plaintiff's inadequate medical care claim. The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). In order to set forth a cognizable claim for a violation of adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Estelle*, 429 U.S. at 106. Deliberate indifference is more than mere malpractice or negligence; it

is a state of mind equivalent to reckless disregard of a known risk of harm. *See Farmer v. Brennan*, 511 U.S. 825 (1994).

Typically, non-medical prison officials "who are not themselves physicians cannot 'be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.'" *Davis v. Norwood*, 614 F. App'x 602, 605 (3d Cir. 2015) (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)). Prison officials may, however, be deliberately indifferent, if they "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds*, *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (citation omitted). A prison official may also be liable under the Eighth Amendment if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

Here, both parties agree that HCV constitutes a serious medical condition. They disagree, however, on whether Plaintiff has alleged sufficient facts to establish that Defendant Lanigan was deliberately indifferent to Plaintiff's serious medical need. Plaintiff states that Defendant Lanigan, as Commissioner of NJDOC, "adopt[ed] the FBOP HCV treatment guidelines that with deliberate indifference, erected arbitrary and burdensome procedures/policy that caused [Plaintiff's] HCV treatment to be repeatedly denied simply because the treatments were too expensive[.]" (Am. Compl. ¶ 121.) Plaintiff also asserts that Defendant Lanigan "implement[ed] what [he] should have known were unconstitutional and dangerous guidelines that caused [Plaintiff] to suffer with HCV related symptoms . . ." (*Id.* ¶ 126.) The Court finds these allegations insufficient to demonstrate deliberate indifference on the part of Defendant Lanigan.

7

It is not adequate for Plaintiff to allege that Defendant Lanigan enacted a deficient policy. Instead, Plaintiff must allege that Defendant Lanigan adopted that policy with deliberate indifference, *i.e.*, a reckless disregard of a known risk of harm. *See Barkes*, 766 F.3d at 319-20 ("[A] state official, by virtue of his or her *own* deliberate indifference to *known* deficiencies in a government policy or procedure, [must have] allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury *does* occur.") (emphasis in original); *see also Farmer*, 511 U.S. 825 (explaining that deliberate indifference is akin to a reckless disregard of a known risk of harm). Plaintiff states, in a purely conclusory manner, that Defendant Lanigan adopted the FBOP policy with "deliberate indifference," without providing any facts to support this claim. (*See* Am. Compl. ¶ 121.) There is nothing to indicate that Defendant Lanigan was aware of the inherent risk in the FBOP HCV policy, yet chose to implement it regardless. *See Barkes*, 766 F.3d at 330 (adopting four-part test for determining when a supervisor may be deliberately indifferent under the Eighth Amendment: "(1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-*official was aware that the policy created an unreasonable risk*; (3) *the defendant was indifferent to that risk*; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.") (citation omitted) (emphasis added).

Nor can Plaintiff establish that Defendant Lanigan had knowledge of the alleged constitutional violation. *See Spruill*, 372 F.3d at 236. The Amended Complaint provides a detailed account of all the instances in which Plaintiff was seen by medical professionals during the course of his incarceration. That list includes: Nurse Alvarado, Nurse Ivery, Dr. Farooq, Dr. Ahsan, Nurse Brewin, and Dr. Nwachukwu. Plaintiff was immediately screened for HCV upon entering NJSP, and received blood tests, screenings, and ultrasounds, as well as a consultation with an infectious

disease specialist. Further, as Plaintiff explains, it is Defendant Brewer, not Defendant Lanigan, who has final authority to determine whether Plaintiff receives HCV treatment, per IMP guidelines.

These facts make clear that Plaintiff was being seen by medical professionals for his HCV, and indicate that Defendant Lanigan played no role in Plaintiff's medical care. *See Spruill*, 372 F.3d at 326 ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). While Plaintiff does allege that he filed grievances and institutional inquiries requesting HCV treatment, Plaintiff fails to indicate if any of his correspondence was directed at Defendant Lanigan. *See Iqbal*, 556 U.S. at 676 ("A plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). For these reasons, Plaintiff's inadequate medical care claim against Defendant Lanigan must be dismissed.

Plaintiff's conditions of confinement claim against Defendant Lanigan is similarly unavailing. To prevail on a conditions of confinement claim, an inmate must be able to allege, "(1) the prison official deprived the prisoner of the minimal civilized measure of life's necessities; and (2) the prison official acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015) (citation omitted). "A supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) (quotations and citation omitted). There are simply insufficient facts, as pled, to meet these standards. Simply alleging that Defendant Lanigan, as Commissioner of NJSP, is responsible for adopting the FBOP guidelines,

is insufficient to state a claim for relief. *See Beers–Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (the actual knowledge requirement for the deliberate indifference standard of prison condition claims requires that officials "actually be aware of the existence of the excessive risk; *it is not sufficient that the official should have been aware.*") (emphasis added). Plaintiff has not alleged, for example, that he wrote directly to Defendant Lanigan, or that Defendant Lanigan, specifically, was involved in denying Plaintiff HCV treatment. Thus, the claims against Defendant Lanigan are simply too tenuous to establish entitlement to relief. For these reasons, Plaintiff's conditions of confinement claim against Defendant Lanigan must similarly be dismissed. The Court emphasizes, however, that at this early stage the Court makes no finding as to the overall strength of Plaintiff's claims against other Defendants in this action. Instead, this Opinion relates solely to the facts, as pled, against Defendant Lanigan.

## IV. CONCLUSION

For the foregoing reasons, Defendant Lanigan's Motion to Dismiss Plaintiff's Amended Complaint is GRANTED. Plaintiff's claim for damages against Defendant Lanigan in his official capacity are DISMISSED WITH PREJUDICE. Plaintiff's remaining claims against Defendant Lanigan are DISMISSED WITHOUT PREJUDICE. An appropriate order follows.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated: May 21, 2019